# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PATRICIA A. MURPHY and KEVIN | ) | |
| MURPHY, Guardians of Kathleen M. Murphy, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO. 3:13-CV-12839-MAP** |
| MASSACHUSETTS DEPARTMENT OF | ) | |
| DEVELOPMENTAL SERVICES, et al., | ) | |
| Defendants. | ) | |
| _____ | ) | |

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTIONS TO DISMISS THE AMENDED VERIFIED COMPLAINT

### December 4, 2014

Hennessy, M.J.

By order of reference (Docket #55), and pursuant to 28 U.S.C. § 636(b)(1)(B), this matter was referred to me for a Report and Recommendation on the Defendants' motions to dismiss Plaintiffs' claims under Rules 12(b)(1) and 12(b)(6). (Dockets #48, #50, #62).[1] Plaintiffs have filed oppositions to each of the Defendants' motions. The parties appeared before me at hearings on July 1, 2014 and July 29, 2014. This matter is now ripe for adjudication.

Plaintiffs are guardians of an intellectually disabled adult woman who has been living in facilities tailored to meet her needs. These facilities are operated by private corporations who contract with Massachusetts to provide such services. Alleging instances of neglect, negligence and misconduct at four privately-operated homes where their ward had lived, Plaintiffs charge that Massachusetts maintains two separate and unequal systems of residential care for the

---

[1] As discussed at the July 1, 2014 hearing with the parties, and pursuant to District Judge Ponsor's September 26, 2014 Order, this court has considered the arguments raised in the original motions to dismiss filed at Dockets #32 and #36, and their supporting papers. (See Hearing Transcript, Docket #68 at pp. 4-6; Docket #72).

intellectually disabled: a stable, cost-effective system of residential group homes operated and administrated directly by the Commonwealth, and a grossly mismanaged system of homes operated by private corporations where the basic human rights of intellectually disabled individuals are ignored. According to the guardians, this two-tiered system exists to enrich executives of the corporate vendors and, because it is funded with federal and state money, violates federal and state laws as well as the constitutional rights of the disabled. A plain reading of the amended complaint exposes the factual insufficiency of the guardians' claims concerning the existence of two systems of care. The guardians' personal experience may identify deficiencies in care provided to their ward in a handful of homes, but the absence of specific, plausible allegations about the entire system of residential care for intellectually disabled persons dooms their attempt, however noble, to plead a credible, wholesale indictment of the system. For the reasons set forth herein, I recommend that the motions to dismiss (Dockets #48, #50, #62) be granted in part and denied in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Patricia A. Murphy and Kevin Murphy (collectively, "Plaintiffs") are guardians of Kathleen M. Murphy ("Murphy"). (Docket #42 at ¶¶ 23-25). Murphy is a sixty-one year-old woman with severe intellectual disabilities. (Id. at ¶ 1). She functions at roughly the level of a six year-old, communicates verbally at a basic level, cannot read, and requires assistance with many activities of daily living. (Id. at ¶ 122). Murphy receives services from the Commonwealth of Massachusetts through the Department of Developmental Services ("DDS"). (Id. at ¶ 26). Murphy currently resides at a group home operated by the Commonwealth, but resided previously in group homes operated by private corporations funded by the Commonwealth and federal government. (Id. at ¶ 1).

Defendant DDS is a division of the Commonwealth, and authorized by Mass. Gen. Laws ch. 19B. (Id. at ¶ 26). Four DDS employees are also named as Defendants: John Polanowicz, Secretary of the Commonwealth's Executive Office of Health and Human Services; Elin Howe, Commissioner of DDS; Daniel Lunden, Regional Director for DDS; and Robin Harmatz, Area Director for DDS. (Id. at ¶¶ 27-30) (collectively with DDS, the "DDS Defendants"). Plaintiffs also sue Lunden and Harmatz in their individual capacities for damages. (Id. at ¶¶ 29-30).

Until February 27, 2014, DDS had contracted Murphy's care to Defendant ServiceNet, Inc. ("ServiceNet"), a Massachusetts corporation. ServiceNet owns and operates community based group homes in Massachusetts, including one in Chicopee, where Murphy lived when the Plaintiffs filed their complaint. (Id. at ¶ 31). Seven officers of ServiceNet are named as Defendants in their official and individual capacities: Susan Stubbs, President and Chief Executive Officer; Bruce Barshefsky, Vice President of Administration and Finance; James Frutkin, Vice President of Clinical Services; Abbas Hamdan, Vice President of Development/Brain Injury Service; Jay Pasternack, Vice President of Mental Health Services; Ali Moshiri, Medical Director; and Jay Sacchetti, Vice President of Shelter/Substance Abuse/Vocational Services. (Id. at ¶¶ 32-38) (collectively with ServiceNet, the "ServiceNet Defendants"). Plaintiffs do not allege that any of these individuals provided direct care to Murphy.

<u>Murphy Suffers Harm</u>

Murphy qualifies for educational, residential and day services from DDS. (Docket #42 at ¶ 123). Over the years, Murphy has lived in four privately-operated group homes, two owned by ServiceNet and two owned by the Western Massachusetts Training Consortium ("Consortium"). (Id. at ¶ 130). While living in a ServiceNet home, Murphy's psychological and physical health

deteriorated, which Plaintiffs attribute to gross mismanagement by ServiceNet and DDS. (Id. at ¶¶ 4-11, 125). A ServiceNet psychiatrist diagnosed Murphy with bipolar disorder and prescribed Depakote and Risperdal. (Id. at ¶ 126). The effects of these drugs included listlessness and a stark change from Murphy's typically upbeat manner. (Id. at ¶ 127). Murphy's family reported the effects of the drugs and their concerns to a service coordinator and Harmatz at DDS. (Id.). In 2005, Murphy fell, breaking her arm, injuring her head and requiring hospitalization. (Id. at ¶ 128). While hospitalized, treating physicians determined that Murphy had toxic levels of Depakote and high levels of Risperdal. (Id.). Toxic levels of Depakote can cause dizziness, drowsiness, sedation, Parkinsonian-like tremors and brain damage. (Id.). Murphy's family arranged a comprehensive psychological evaluation at UMass Medical Center. (Id. at ¶ 129). Examiners concluded Murphy's diagnosis of bipolar disorder was inaccurate, and that the high doses of Risperdal and Depakote were unnecessary and had jeopardized Murphy's health. (Id.).

While residing at the homes operated by the Consortium, the guardians noticed deficiencies in Murphy's care. (Id. at ¶ 131). For instance, to treat rheumatoid arthritis, Murphy was given an immunosuppressant that required Murphy's isolation in the event of illness. (Id. at ¶ 132). However, when Murphy fell ill in December 2007, the Consortium failed to take this precaution. (Id. at ¶ 133). In response to the guardians' complaint about deficiencies in her care at the Consortium, Harmatz threatened to curtail Murphy's parents' visitation rights. (Id. at ¶ 134). In 2008, someone removed and disposed of a suitcase of Murphy's clothing. (Id. at ¶ 135). Murphy's mother reported this incident to the group home where she was living, but no action was taken. (Id. at ¶ 136). As a result, Murphy was left without necessary clothing for an extended period of time. (Id. at ¶ 137). When Murphy's parents voiced their concern, Harmatz accused them of acting inappropriately during visits. (Id. at ¶ 138). On November 5, 2008,

Harmatz sent a letter to Murphy's counsel stating that "the department will be making alternative arrangements to provide for [Murphy's] care with another service provider at another location no later than December 30, 2008." (Id. at ¶ 140).

In early 2009, after substantial negotiations, DDS and counsel for the guardians agreed that: (1) Murphy would be transferred to a ServiceNet facility; and (2) that DDS was obligated to use its "best efforts" to place Murphy in a state-operated home.  (Id. at ¶ 142; Docket #42-2 at ¶ 2).  Specifically, DDS "agree[d] to offer the Guardians the opportunity to select, on [Murphy's] behalf, the first appropriate available vacancy at a state-operated group home with the appropriateness of the vacancy to be determined in accordance with the criteria set forth … below."  (Docket #42 at ¶ 143; Docket #42-2 ¶ 2).  Further, the agreement stated that "continuing indefinitely, [DDS] will promptly report to the Guardians any vacancies at state-operated group homes as those vacancies are determined by [DDS] to be appropriate." (Docket #42 at ¶ 144; Docket #42-2 at ¶ 3).  Harmatz signed on behalf of DDS.  (Docket #42 at ¶ 145; Docket #42-2).

In 2013, Plaintiffs "reviewed various documents concerning Ms. Murphy's care … includ[ing] ServiceNet Shift Notes (nearly half of which are missing), Weekly Data Sheets, Weekly Activities Logs and Medication Administration Records."  (Id. at ¶ 153).  Plaintiffs allege these documents indicate that ServiceNet failed to treat Murphy for dangerously high blood pressure for more than seven months, including during a "hypertensive crisis." (Id. at ¶¶ 153-154).  According to the American Heart Association ("AHA"), consequences of uncontrolled blood pressure in the ranges reported for Murphy include stroke, loss of consciousness, memory loss, heart attack, damage to the eyes and kidneys, aortic dissection, angina (unstable chest pain), and pulmonary edema (fluid backup in the lungs).  (Id. at ¶ 160).  The AHA advises that an individual with additional abnormal clinical symptoms on the same

date as a hypertensive crisis has an even greater risk of death or permanent harm. (Id.). Shift notes from this time indicate Murphy complained of stomach pain. (Id. at ¶ 161). ServiceNet neither contacted Murphy's primary care physician nor brought her to an emergency room. (Id. at ¶ 162).

Shift Notes from July 2013 indicate that during or near the time of the hypertensive crisis, Murphy was repeatedly in pain and often lying in her own waste. (Id. at ¶¶ 163-65). There is no indication that ServiceNet addressed these conditions. (Id.). On July 30, 2013, Murphy reported that a staff member had threatened her with violence; there is no indication that ServiceNet investigated this incident. (Id. at ¶ 166).

The Shift Notes further indicate that Murphy had consistently high blood pressure. The AHA recommends that people with three readings above 140/90 should be examined by a physician and placed on medications to lower blood pressure and avoid further damage to the body. (Id. at ¶ 169). Over a 31-week period, Murphy had 28 weekly blood pressure readings; 26 of these readings were above 140/90 -- and many were substantially higher. (Id.). There is no indication that ServiceNet acted to alleviate Murphy's high blood pressure or reported it to her primary care physician during this time. (Id.).

When cleaning up a spill on February 26, 2013, Murphy got laundry detergent in her eye, requiring an emergency room visit and a follow-up visit with her primary care physician. (Id. at ¶ 172). On April 15, 2013, Murphy jumped from a vehicle at a busy intersection. (Id. at ¶ 173). Property, including jewelry, was taken from Murphy. (Id. at ¶ 174). On May 17, 2013, a ServiceNet employee stole $9.17 from Murphy. (Id. at ¶ 175). There is no indication that ServiceNet addressed these incidents -- as evidenced, in part, by the fact that the employee still worked with Murphy over Plaintiffs' objection. (Id. at ¶¶ 174-75, 178).

On September 15, 2013, the guardians' counsel wrote to DDS regarding threats to Murphy's health, safety and welfare at the ServiceNet residence where she was living; counsel requested that DDS act promptly to move Murphy to a state-operated home. (Docket #42 at ¶¶ 149-150; Docket #42-3). DDS refused the request. (Docket #42 at ¶ 151). DDS's counsel provided assurances to Plaintiffs' counsel that Harmatz was working to locate a state-operated home for Murphy. (Id. at ¶ 179). However, the only action taken by Harmatz was to direct the ServiceNet staff to advise Murphy that she was being moved to a "nursing home." (Id. at ¶ 181).

On September 26, 2013, Marcia Morris, the Director of Operations at the ServiceNet home where Murphy lived, contacted Patricia Murphy and reported that Murphy was in a state of distress because she believed she was going to be moved to a nursing home. (Id. at ¶ 182). When Patricia Murphy spoke to Murphy on the telephone, Murphy was distressed at being told by a newer female employee that she was to be moved to a nursing home. (Id. at ¶ 183). As a result of her distress, Murphy threw the phone, disconnecting the call. (Id.). Morris called a second time on September 26, 2013, and informed Patricia Murphy that Murphy had broken her glasses while in a state of distress. (Id. at ¶ 184). These events took place only days after Harmatz communicated with Murphy's caregivers at ServiceNet. (Id. at ¶ 185). Since then, Murphy has continued to suffer physical, medical and psychological harm. (Id. at ¶ 152).

<u>ServiceNet and Its Liability</u>

Plaintiffs allege that the named ServiceNet officers have individual and shared responsibility for the care of Murphy while she lived in ServiceNet homes. (Docket #42 at ¶ 187). Plaintiffs further allege that although ServiceNet is a private corporation, it acted under color of law as an agent of the state, providing services to intellectually disabled individuals. (Id. at ¶ 189). Plaintiffs contend generally that the ServiceNet Defendants individually and

collectively set policy, oversaw the hiring and firing of direct-care workers, set salaries for managers and direct-care workers, decided on staffing levels, and established clinical protocols and procedures for the ServiceNet homes. (Id. at ¶ 190). Plaintiffs also allege that under the management of these Defendants, the care at ServiceNet group homes is "materially deficient" in comparison to the care at state-operated group homes. (Id. at ¶ 193). The amended complaint contends Defendants hired direct care workers lacking the skill to recognize dangerous blood pressure readings, and who left Murphy lying in their own waste. (Id. at ¶ 194). Plaintiffs allege that Defendants' policies led to constant staff changes, to Murphy's detriment. (Id.) Additionally, the amended complaint posits that the individual Defendants acted deliberately and/or with deliberate indifference to unjustly enrich themselves, and to discriminate against, and violate the constitutional rights of, Murphy by paying themselves astronomical salaries from taxpayer funds that otherwise would be available to pay, train, and supervise competent direct care workers at ServiceNet homes, including the home where Murphy lived. (Id. at ¶ 195). Plaintiffs allege that ServiceNet's IRS Form 990 for 2012 showed the following compensation paid to its officers: Stubbs ($170,391); Barshefsky ($139,011); Frutkin ($134,752); Hamdan ($128,849); Pasternak ($112,142); Moshiri ($150,931); and Sacchetti ($122,581). (Docket #42 at ¶¶ 32-38). The amended complaint contends that these allegations show these Defendants have individually and collectively caused harm to Murphy. (Id. at ¶ 192).

Plaintiffs File Suit

Plaintiffs filed their complaint on November 8, 2013. (Docket #1). Plaintiffs' claims stem from Murphy's past and possible future placement at a home operated by a private corporation. They allege that the state homes provide "stable and effective" care because "[d]irect care workers typically remain[ed] in their jobs for years … providing disabled

individuals with much-needed continuity of care." (Docket #42 at ¶ 70). Plaintiffs claim the

state's decision to contract with corporate vendors like ServiceNet has created "two separate and

unequal systems of care and housing for intellectually disabled individuals -- one of stable,

constitutionally and statutorily sufficient state-operated homes, and the other of grossly unfit,

constitutionally and statutorily deficient privately-operated homes." (Id. at ¶ 72). Plaintiffs

contend that all privately-operated homes are "grossly mismanaged" to the extent that "the basic

human rights of intellectually disabled individuals are ignored." (Id. at ¶ 6).

The majority of the allegations directed at the individual Defendants concern Harmatz

only. Plaintiffs allege that Harmatz "has personally taken specific actions to confine Ms.

Murphy in this dangerous home, and to harm and torment Ms. Murphy and her family," and has

"intentionally caused emotional distress to Ms. Murphy by directing ServiceNet staff to advise

Ms. Murphy that she is being moved to a 'nursing home.'" (Docket #42 at ¶¶ 13, 181).

Sometime near 2005, Murphy's guardians informed Harmatz that Murphy seemed

overmedicated and listless. (Id. at ¶ 127). In 2008, Harmatz "began to falsely accuse [Murphy's

parents] of acting inappropriately during visits" in an attempt to harass, intimidate and frighten

them. (Id. at ¶ 137). Harmatz wrote a letter in 2008 in contravention of the transfer statute. (Id.

at ¶ 141). Harmatz has "willfully failed and refused to protect Ms. Murphy from this harm or to

comply with the Agreement between the Guardians and DDS, and ha[s] acted intentionally to

harm Ms. Murphy." (Id. at ¶ 177). "Ms. Harmatz has not made any diligent efforts whatsoever

to locate a state-operated home for Ms. Murphy, or to rectify the serious dangers to Ms.

Murphy's health, safety, and welfare that exist at the Jacob Street residence." (Id. at ¶ 180).

"Ms. Harmatz has … intentionally caused emotional distress to Ms. Murphy by directing

ServiceNet staff to advise Ms. Murphy that she is being moved to a 'nursing home.'" (Id. at ¶

181).  "Ms. Harmatz personally and directly communicated with individuals at ServiceNet concerning Ms. Murphy's care."  (Id. at ¶ 185).  She is alleged to "have direct responsibility to ensure the health, safety and welfare of individuals living at the [ServiceNet] home, including Ms. Murphy."  (Id. at ¶ 272).

Four of the 359 paragraphs of the amended complaint mention other DDS employees. Lunden, the Regional Director of DDS, is alleged to have "direct responsibility to ensure the health, safety and welfare of individuals living at the [privately-operated] home, including Ms. Murphy," (id.), and to have "strategic, operational, and logistical control over the care of intellectually disabled individuals in the Commonwealth."  (Id. at ¶ 274).  Polanowicz and Howe, in their official capacities, are alleged to have been "primarily responsible for ensuring that DDS complies" with federal laws regarding Medicaid assistance from the federal government.  (Id. at 304).  Lastly, Plaintiffs allege that Polanowicz and Howe have "direct responsibility to ensure the health, safety and welfare" of Murphy.  (Id. at ¶ 307).

With respect to the individual ServiceNet Defendants, there are only a handful of allegations that even mention them.  Plaintiffs allege the ServiceNet individuals were "collectively responsible for setting the policies and engaging in the acts and/or omissions that have caused this harm to Ms. Murphy," (id. at 192); "acted individually and collectively to discriminate against Ms. Murphy and to violate her constitutional rights," (id. at ¶ 193); and "acted deliberately and/or with deliberate indifference to unjustly enrich themselves ... by paying themselves astronomical salaries, from taxpayer funds."  (Id. at ¶ 195).  Moreover, Plaintiffs contend the ServiceNet individuals were "compensated in these unconscionable amounts even as they knew, or recklessly failed to discern, that ServiceNet homes were being run in a

constitutionally deficient fashion." (Id. at ¶ 198). In addition to these broad allegations, Plaintiffs allege that Hamdan knew of Murphy's suffering and failed to help her. (Id. at ¶ 14).

District Judge Ponsor held a hearing on Plaintiffs' request for a preliminary injunction on November 21, 2013. (Docket #26). Judge Ponsor denied the motion without prejudice, finding Plaintiffs did not adequately show either irreparable harm or a likelihood of success on the merits. (Docket #30 at pp. 37-38). Thereafter, Defendants filed motions to dismiss, (Dockets #32, #36), which were pending when Plaintiffs amended the complaint as a matter of course on December 20, 2013. (Docket #42). The amended complaint contains the following fourteen counts: violation of the Americans with Disabilities Act (Count I); preliminary injunctive relief under 42 U.S.C. § 1983 (Counts II, III, VI, XI); money damages under 42 U.S.C. § 1983 (Counts IV, V); injunctive relief under Massachusetts Civil Rights Act (Count VII); money damages under Massachusetts Civil Rights Act (Count VIII); intentional infliction of emotional distress (Count IX); negligent infliction of emotional distress (Count X); permanent injunctive relief regarding enforcement of the Medicaid Act and Rehabilitation Act (Count XII); permanent injunctive relief regarding enforcement of Mass. Gen. Laws ch. 19B (Count XIII); and permanent injunctive relief to protect Murphy's federal and state constitutional rights (Count XIV). (Id.). Plaintiffs also seek appointment of a master, pursuant to Fed. R. Civ. P. 53, who would "ensure compliance" with various federal and state laws, and monitor and reform privately-operated group homes. (Id.)

On February 27, 2014, subsequent to the filing of the amended complaint, Murphy was moved to a state-operated group home with Plaintiffs' consent and support. (Docket #62). Even though Plaintiffs and Murphy are satisfied with her current placement, Plaintiffs' counsel represented at the July 29, 2014 hearing that Plaintiffs are unwilling to withdraw their injunctive

claims without a written guarantee from DDS that Murphy will never be placed in a privately-operated home. Plaintiffs' counsel represented to the court that DDS has not provided an agreement that satisfies Plaintiffs' concerns.

In the wake of the amended allegations, all Defendants renewed their motions to dismiss. (Dockets #48, #50). Once Murphy was transferred to a state-operated home, the DDS Defendants filed a supplemental motion to dismiss, asserting that most claims had become moot. (Docket #62). Plaintiffs oppose each motion filed by Defendants. (Dockets #52, #54, #66).

## II. STANDARDS OF REVIEW

Defendants challenge the court's subject matter jurisdiction and the sufficiency of the amended complaint. The proper vehicle for challenging a court's subject matter jurisdiction is Federal Rule of Civil Procedure 12(b)(1). See Valentin v. Hosp. Bella Vista, 254 F.3d 358, 362 (1st Cir. 2001). Within the scope of the rule are challenges to subject matter jurisdiction based on mootness and sovereign immunity. See id. at 363. When confronting a colorable challenge to subject matter jurisdiction, the preferred practice is that a court resolve such challenge before weighing the merits of the case. See Morales Feliciano v. Rullan, 303 F.3d 1, 6 (1st Cir. 2002). In performing this task "a district court must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor." Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010).

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to raise a right to relief above the

speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (internal citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556)). When deciding a Rule 12(b)(6) motion, the court "must assume the truth of all well-plead facts and give the plaintiff the benefit of all reasonable inferences therefrom."[2] Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007). However, the court is not bound to accept as true legal conclusions couched as factual allegations. See Iqbal, 556 at 678. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555). Dismissal is appropriate if a plaintiff's well-pleaded facts do not "possess enough heft to show that [the] plaintiff is entitled to relief." Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and original alterations omitted).

Lastly, Rule 8 of the Federal Rules of Civil Procedure provides, in relevant part, that "[a] pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). The statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Phelps v. Local 0222, No. 09-11218-JLT, 2010 WL 3342031, at *5 (D. Mass. Aug. 20, 2010) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002)). In addition, the pleadings must afford the defendants "a meaningful opportunity to mount a defense." Diaz-Rivera v. Rivera-Rodriguez, 377 F.3d 119, 123 (1st Cir. 2004) (quotation omitted). "[T]he

---

[2]  Because the court must accept Plaintiffs' factual allegations as true, affidavits from DDS Defendants disputing such allegations are disregarded.

complaint should at least set forth minimal facts as to who did what to whom, when, where, and why -- although why, when why means the actor's state of mind, can be averred generally." Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61, 68 (1st Cir. 2004).

### III.    DISCUSSION

The court turns first to Defendants' two-pronged challenge to this court's subject matter jurisdiction:  (A) that Murphy's transfer to a state-operated home moots Plaintiffs' prayer for injunctive relief; and (B) that the doctrine of sovereign immunity bars all claims asserted against the DDS Defendants in their official capacities.  Plaintiffs bear the burden of establishing subject-matter jurisdiction.  See Thomson v. Gaskill, 315 U.S. 442, 446 (1942); Aversa v. United States, 99 F.3d 1200, 1209 (1st Cir. 1996).

### A.  Mootness[3]

Defendants contend that Murphy's transfer to a state-operated home moots Plaintiffs' prayer for injunctive relief.  Plaintiffs maintain that because Murphy could be "unlawfully moved from her [state] residence, against her own will and that of her family," they are entitled to conduct discovery on matters including whether (1) DDS might transfer Murphy to a privately-operated home, and (2) DDS intends to privatize its entire system of care, thus rendering Murphy's return to a privately-operated home inevitable.  (Docket #66).

---

[3]   Defendants have appropriately not sought dismissal on the basis of standing.  "[Q]uestions of standing and questions of mootness are distinct, and it is important to treat them separately." Boston's Children First v. Boston Sch. Comm., 183 F. Supp. 2d 382, 393 (1st Cir. 2002) (quoting Becker v. Fed. Election Comm'n, 230 F.3d 381, 386 n.3 (1st Cir. 2000)).  To determine standing, the court looks to the circumstances at the commencement of the case, and not to subsequent events that might otherwise divest the court's jurisdiction.  See Becker, 230 F.3d at 386 n.3.  Because Murphy was living in a privately-operated home at the time the Plaintiffs filed their complaint, Plaintiffs have standing.

"Mootness is a ground which should ordinarily be decided in advance of any determination on the merits." Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 52 (1st Cir. 2013). "If events have transpired to render a court opinion merely advisory, Article III considerations require dismissal of the case."[4] Mangual v. Rotger-Sabat, 317 F.3d 45, 60 (1st Cir. 2003). Here, Plaintiffs seek an injunction compelling Defendants to transfer Murphy from a privately-operated home to a state-operated home. (Docket #42, Counts I, II, III, VI, XI).[5] However, as of February 2014, that transfer has been effected, and Murphy now resides in a state-operated home. As such, insofar as Plaintiffs seek injunctive relief to compel Defendants to place Murphy in a state-operated home, this action has lost "its character as a present, live controversy of the kind that must exist to avoid advisory opinions." Hall v. Beals, 396 U.S. 45, 48 (1969).

This court is not persuaded by Plaintiffs' claim that their prayer for injunctive relief is not moot because Murphy "could be" transferred to a corporate home. Massachusetts law provides for notice and an opportunity to be heard before Murphy can be transferred. See Mass. Gen. Laws ch. 123B, § 3. DDS is required to give a guardian notice of its intent to transfer an individual at least 45 days before the transfer. Id. The guardian then has 45 days to object to the transfer. Id. Within twenty days of the objection, DDS must request an adjudicatory proceeding with the Massachusetts Department of Administrative Law Appeals ("DALA"). Id. Thereafter, the DALA magistrate will issue a written decision, and the parties will have twenty days to

---

[4]  "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy." City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983).

[5]  Plaintiffs also seek injunctive relief at Counts VII, XII, XIII, and XIV, but in those counts, Plaintiffs seek to change the two-tiered system, not Murphy's placement. For that reason, those counts are addressed in the discussion infra.

appeal the decision to Massachusetts Superior Court.  Id.  From there, decisions can be appealed

in due course.  See, e.g., Davidson v. Howe, 749 F.3d 21, 24-25 (1st Cir. 2014).  This court fails

to see why this protocol does not protect Murphy and render injunctive relief, at this stage,

advisory.

Accordingly, Plaintiffs' prayers for injunctive relief regarding Murphy's transfer are

moot.  The motion to dismiss the claims which seek injunctive relief -- Counts I (insofar as it

seeks injunctive relief), II, III, VI, and XI -- should therefore be granted.

B.  Sovereign Immunity

Under the second prong of the Rule 12(b)(1) argument, the DDS Defendants contend that

the doctrine of sovereign immunity bars Plaintiffs' claims against the Commonwealth and its

agencies, and warrants dismissal of Counts I, VIII and X.[6]  The Eleventh Amendment ordinarily

renders states immune from suits for monetary relief by private citizens.  See Seminole Tribe of

Fla. v. Florida, 517 U.S. 44, 54 (1996).  "[A] suit by private parties seeking to impose a liability

which must be paid from public funds in the state treasury is barred by the Eleventh

Amendment."  Edelman v. Jordan, 415 U.S. 651, 663 (1974).  This principle applies equally to

state officials acting in their official capacities.  See Will v. Mich. Dep't of State Police, 491 U.S.

58, 71 (1989) ("a suit against a state official in his or her official capacity is not a suit against the

official but rather is a suit against the official's office"); Davidson, 749 F.3d at 27.  Applying the

foregoing, Plaintiffs' claims for money damages against DDS and the DDS employees in their

official capacities are barred by the doctrine of sovereign immunity.  Accordingly, this court

---

[6]    The parties do not contest that the Department of Developmental Services is a state agency
that is a "legal entity of state government."  (Docket #41 at p. 3).

recommends dismissal of Count VIII (Mass. Civil Rights Act), and Count X (Negligent Infliction of Emotional Distress) against these DDS Defendants.

Count I, insofar as it seeks damages against the DDS Defendants, requires further scrutiny. In Count I, Plaintiffs claim that Defendants have discriminated against Murphy within the meaning of the Americans with Disabilities Act ("ADA"), by forcing her to remain in a privately-operated home where she is receiving substandard care and is suffering serious physical and psychological harm. (Docket #42 at ¶ 230). Plaintiffs further allege that Murphy "is suffering intra-class discrimination … in that she … is forced to receive substandard services at corporate-operated homes, and is being excluded from the sufficient services available at state-operated homes." (Id. at ¶ 231). Plaintiffs claim that sovereign immunity does not bar Count I.

To be sure, 42 U.S.C. § 12202 of Title II of the ADA provides:

> A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter. In any action against a State for a violation of the requirements of this chapter, remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in an action against any public or private entity other than a State.

42 U.S.C. § 12202; see also Tennessee v. Lane, 541 U.S. 509, 518 (2004).[7] Despite this broad language, the DDS Defendants argue that Plaintiffs' Title II claim falls outside the limited circumstances where abrogation would be appropriate. See United States v. Georgia, 546 US. 151, 159 (2006) (addressing actual violations of the Fourteenth Amendment); Lane, 541 U.S. at 530-31 (addressing plaintiffs' rights to physical access to courtrooms). To determine whether

---

[7] The ADA is a "broad mandate" of "comprehensive character" and "sweeping purpose" intended "to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life." PGA Tour, Inc. v. Martin, 532 U.S. 661, 675 (2001) (citation and quotation marks omitted); see also 42 U.S.C. § 12101(b)(1), (2).

abrogation of the state's immunity under Title II of the ADA would be valid, a court should determine:

> (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

Georgia, 546 U.S. at 159; see also Buchanan v. Maine, 469 F.3d 158, 172 (1st Cir. 2006) (setting forth the First Circuit's protocol for deciding sovereign immunity issues arising under Title II). "Under Georgia, the court must determine in the first instance … which aspects of the State's alleged conduct violate Title II." Buchanan, 469 F.3d at 172. If no state conduct violates Title II, then the court's analysis stops and the claim ends. Id. at 172-73. Accordingly, this court turns to the merits of the Plaintiffs' Title II allegations.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. "[T]he ADA does not itself mandate the provision of services, [but] it does prohibit discrimination against the disabled within the services that are provided." Buchanan, 469 F.3d at 174 (emphasis omitted).

The gist of Plaintiffs' Title II claim is captured in paragraph 6 of the amended complaint, namely, that Massachusetts maintains "two separate and unequal systems of residential care for intellectually disabled individuals … a stable, cost-effective system of residential group homes operated and administrated directly by the Commonwealth … [and] a grossly mismanaged system of homes operated by private corporations where the basic human rights of intellectually disabled individuals are ignored." (Docket #42 at ¶ 6). Similarly, in the two paragraphs of

Count I of the amended complaint, cited and quoted above (at p. 17), Plaintiffs allege that there is a two-tiered system of care: the state-operated homes which provide "sufficient services," and the "privately-operated system, where … substandard care" is provided. (Id. at ¶ 231). Plaintiffs allege discrimination and seek damages because Murphy was placed in a privately-operated home where care is allegedly inferior.

In this court's view, these allegations fail to allege a violation of Title II. In so finding, this court is mindful of the Court's instructions in Iqbal that in assessing the sufficiency of an allegation, the court is "not bound to accept as true a legal conclusion couched as a factual allegation," Iqbal, 556 U.S. at 678, and "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679. The court may draw on its judicial experience and common sense when determining whether allegations are plausible. Id. Plaintiffs' allegation that discrimination exists because of the two-tiered system is a legal conclusion. It is not entitled to a presumption of truth precisely because it is not supported by sufficient factual allegations. Indeed, a review of the 70 pages of the amended complaint establishes that there are 300 private vendors who operate corporate homes. The actual number of homes, which of course must be greater than the number of vendors operating them, is not alleged. Murphy has lived in a total of four of these more than 300 privately-operated homes, two operated by ServiceNet and two operated by the Consortium. While Plaintiffs allege instances of misconduct or negligence at these four homes, the very limited scope of Murphy's experience is not enough to indict the entire system of hundreds of corporate homes and support Plaintiffs' "two-tiered" claim. The absence of sufficient allegations to support the two-tiered theory is fatal. It means that Plaintiffs have failed to allege "discrimination against the disabled within the services that are provided." Buchanan, 469 F.3D at 174 (emphasis omitted).

Plaintiffs' allegation that executives for vendors of privately-operated homes earned astronomical salaries does not change the result. Plaintiffs allege:

> ServiceNet and its individually named defendants have acted intentionally, and/or with deliberate indifference to discriminate against and violate the constitutional rights of Ms. Murphy and others, by paying themselves astronomical salaries, from taxpayer funds, that otherwise would be available to pay, train, and supervise competent direct care workers ServiceNet [sic] homes.

(Docket #42 at ¶ 232). However, these allegations are, at best, "'merely consistent' with a defendant's liability." Iqbal, 556 U.S. at 678. They simply do not go far enough to render plausible Plaintiffs' ambitious claim that a separate and unequal system of care exists.

Finally, the allegation that Murphy has "been intentionally excluded by DDS, with the assistance and collusion of ServiceNet and its officers, from participation in the constitutionally sufficient system of state-operated homes," (Docket #42 at ¶ 233), is another bare assertion that lacks factual support and cannot be assumed true. To be clear, as was the case in Iqbal, "[i]t is the conclusory nature of [the] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." Iqbal, 556 U.S. at 681. Plaintiffs have therefore "not nudged their claims [regarding the existence of a two-tiered system] across the line from conceivable to plausible." Twombly, 550 U.S. at 570. Because the Plaintiffs' Title II claim fails, there is no need to reach the constitutional question of sovereign immunity. See Georgia, 546 U.S. at 159. The ADA claim in Count I should be dismissed as to the DDS Defendants.

C. Appointment of a Master

One last issue merits passing attention before the court turns to the sufficiency of the Plaintiffs' remaining allegations -- the prayer for appointment of a master pursuant to Fed. R.

Civ. P. 53.[8]  On behalf of the intellectually disabled community, Plaintiffs seek a master to

"ensure compliance" with federal and state laws and to monitor and reform privately-operated

homes.  However, the plain language of Fed. R. Civ. P. 53 makes pellucid that a court may

appoint a master for limited purposes, and Plaintiffs' request is outside the purposes authorized

by rule.  Thus, Defendants' motions to dismiss claims seeking appointment of a master should be

granted. [9]

    D.  <u>Sufficiency of Remaining Claims</u>

What remains is to consider the sufficiency of Plaintiffs' claims for money damages

against Lunden and Harmatz in their individual capacities, money damages against the

ServiceNet Defendants, and the requests for permanent injunctive relief.

---

[8]  Plaintiffs request a master at Count VI (against Polanowicz and Howe to "ensure compliance" with the Medicaid Act and Rehabilitation Act); Count VII (against the DDS Defendants for enforcement of Mass. Gen. Laws ch. 19B (the statute establishing DDS); Count XII (against Polanowicz and Howe to "ensure compliance" with the Medicaid Act and Rehabilitation Act); Count XIII (against Polanowicz and Howe to "ensure compliance" with the Mass. Gen. Laws ch. 19B); Count XIV (against DDS, Polanowicz and Howe to "oversee and protect the intellectually disabled individuals who are currently forced to receive care within the vendor operated system, as well as to oversee and facilitate the transition of all care for intellectually disabled individuals in the Commonwealth from a corporate operated system to an exclusively state operated system;" and to "enjoin the use of any state funds to compensate any officer of any corporate vendor until such time as the Court Master … determines that the individual corporate vendor is acting in compliance with the U.S. Constitution, the Massachusetts Declaration of Rights, the American with Disabilities Act, the Medicaid Act, and the Rehabilitation Act").  (Docket #42).

[9]  Plaintiffs contend that the DDS Defendants waived their argument for dismissal regarding the master because they never raised the argument until the Defendants filed their supplemental motion to dismiss.  (Docket #66 at p. 3).  Regardless, this court may <u>sua</u> <u>sponte</u> dismiss any claim under Fed. R. Civ. P. 12(b)(6) so long "as the procedure employed is fair."  5B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 at 409 (2004).  At the July 1, 2014 hearing, the court afforded the Plaintiffs an opportunity to explain and defend their reasons for seeking appointment of a master (Docket #68 at pp. 27-38); and, Plaintiffs filed a memorandum that addressed their request for a master.  (Docket #66).  Thus, Plaintiffs were afforded a "fair" opportunity to present their position regarding a master.  The court may therefore <u>sua</u> <u>sponte</u> address Plaintiffs' claims for a master.

1. <u>Count I: Alleged Violation of ADA</u>

The ADA claim in Count I (discussed above as to the DDS Defendants) is brought also against the ServiceNet Defendants and against Lunden and Harmatz in their personal capacities. Thus, the claim is otherwise identical, and so too should be its disposition.

Plaintiffs allege simply that the Defendants have discriminated against Murphy in violation of the ADA by "forc[ing] her to receive substandard services at corporate-operated homes" and excluding her from "sufficient services" provided in state-operated homes. (Docket #42 at ¶ 231). Relevant here also are the allegations that these Defendants "discriminate[d]" against Murphy and others "by paying themselves astronomical salaries, from taxpayer funds, that otherwise would be available to pay, train, and supervise competent direct care workers." (<u>Id.</u> at ¶ 232). These allegations, though considered now against the ServiceNet Defendants and Lunden and Harmatz individually, suffer from the same pleading defect as did the allegations against DDS and its officials. They depend entirely on the plausibility of the allegation that Massachusetts maintains "two separate and unequal systems of residential care for intellectually disabled individuals … a stable, cost-effective system of residential group homes operated and administrated directly by the Commonwealth … [and] a grossly mismanaged systems of homes operated by private corporations where the basic human rights of intellectually disabled individuals are ignored." (<u>Id.</u> at ¶ 6). For the reasons stated above, this allegation is conclusory and lacks sufficient factual support to survive scrutiny under Rule 12(b)(6). The ADA claim in Count I should be dismissed in its entirety.

## 2. Count IV: Alleged Constitutional and Statutory Violations

In Count IV, Plaintiffs allege that Lunden and Harmatz, in their individual capacities, have "acted to deprive Ms. Murphy of clearly established constitutional rights and statutory rights, including, without limitation:

> (a) Ms. Murphy's constitutionally protected liberty interest in bodily integrity, and the right to be free from the abuse and injuries described herein, as provided by the 14th Amendment to the U.S. Constitution;
>
> (b) Ms. Murphy's right to equal protection under the 14th Amendment to the U.S. Constitution, in that she is required to remain within the grossly deficient privately-operated system while other developmentally disabled persons in Massachusetts are allowed to reside in constitutionally sufficient state-operated homes;
>
> (c) Ms. Murphy's rights under the Medicaid Act, 42 U.S.C.A. § 1396, which requires the Commonwealth, as a condition of its receipt of Medicaid funds, to provide appropriate services with reasonable promptness and to offer Ms. Murphy and similarly situated individuals appropriate choice concerning residential placements; and
>
> (d) Ms. Murphy's rights under the Rehabilitation Act, 29 U.S.C. § 794, providing that "[n]o otherwise qualified individual with disability … shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

(Docket #42 at ¶ 276). It is apparent from a plain reading of these claims, that subparagraphs (b), (c) and (d) do not state a claim as they depend on Plaintiffs' factually unsupported theory of recovery; namely, that there are two separate and unequal systems of residential care for the intellectually disabled in the Commonwealth. Subparagraph (b) expressly incorporates the allegation of disparate care. The claims of disparate care in violation of the Medicaid Act (subparagraph (c)) and discrimination based on placement in inferior care in violation of the Rehabilitation Act (subparagraph (d)) both implicitly depend on sufficiently pleading separate and unequal systems of care.

The allegation asserted at ¶ 276(a) is not tethered to claims of a two-tiered system of care. The prayer for damages against Lunden and Harmatz to compensate Murphy for alleged violations of the Fourteenth Amendment while Murphy resided in a corporate home must be examined to determine if Plaintiffs have pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

Lunden and Harmatz are sued in their individual capacities. They served DDS as Regional Director and Area Director, respectively. In their individual capacities, the Eleventh Amendment does not immunize them from suit. See Hafer v. Melo, 502 U.S. 21, 27 (1991) ("Through § 1983, Congress sought 'to give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position.'") (quoting Monroe v. Pape, 365 U.S. 167, 172 (1961)). Accordingly, liability must be determined from an examination of what actions Plaintiffs allege Lunden himself, and Harmatz herself, took. See Iqbal, 556 U.S. at 676 ("a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"); Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999) ("It is axiomatic that the liability of persons sued in their individual capacities under section 1983 must be gauged in terms of their own actions.").

Plaintiffs premise Lunden's liability on his role as a supervisor. Supervisory liability under § 1983 cannot be predicated on a theory of respondeat superior, but only on the basis of the supervisor's own acts or omissions. See Iqbal, 556 U.S. at 677 (noting "the term 'supervisory liability' is a misnomer"); Aponte Matos v. Toledo Davila, 135 F.3d 182, 192 (1st Cir. 1998). "There is supervisory liability only if (1) there is subordinate liability, and (2) the supervisor's action or inaction was 'affirmatively linked' to the constitutional violation caused

by the subordinate." Id.; see also Bisbal-Ramos v. City of Mayaguez, 467 F.3d 16, 24 (1st Cir. 2006). The "affirmative link must amount to 'supervisory encouragement, condonation or acquiescence, or gross negligence amounting to deliberate indifference.'" Aponte Matos, 135 F.3d at 192. Deliberate indifference is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Connick v. Thompson, -- U.S. --, 131 S. Ct. 1350, 1360 (2011) (quoting Board of Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 410 (1997)).

Applying these precedents, Lunden cannot be held liable in a supervisory capacity. The totality of Plaintiffs' allegations regarding Lunden is that he had "direct responsibility to ensure the health, safety and welfare of individuals living at the [privately-operated] home, including Ms. Murphy," and had "strategic, operational, and logistical control over the care of intellectually disabled individuals in the Commonwealth." (Docket #42 at ¶¶ 272, 274). These allegations are insufficient to show supervisory encouragement, condonation or acquiescence, or deliberate indifference. Indeed, Plaintiffs fail to allege that Lunden even knew of the alleged harm to Murphy, or any situations that would have put Lunden on notice of the alleged harm suffered by Murphy. Nor are there allegations that Lunden ignored warning signals or failed to investigate incidents with Murphy. Such allegations are necessary to establish supervisory liability. Compare Doe v. Bradshaw, C.A. No. 11-11593-DPW, 2013 WL 5236110, at *5 (D. Mass. Sept. 16, 2013) (defendants received reports and "engaged in only minimal efforts to investigate"), with Lipsett v. Univ. of Puerto Rico, 864 F.2d 881, 907 (1st Cir. 1988) (defendants failed to take "any steps whatsoever to investigate" reports of harassment), and Doe v. Fournier, 851 F. Supp. 2d 207, 225 (D. Mass. 2012) (defendants "failed to conduct any investigation" into allegations of abuse). Thus, Plaintiffs fail to "affirmatively link" Lunden to the alleged

constitutional violation.  See Camilo-Robles v. Zapata, 175 F.3d 41, 43-44 (1st Cir. 1999), cert. denied, 525 U.S. 1105 (1999); Lipsett, 864 F.2d at 902; see also Educadores, 367 F.3d at 68 ("in a civil rights action as in any other action subject to notice pleading standards, the complaint should at least set forth minimal facts as to who did what to whom, when, where, and why").  Therefore, the court recommends dismissal of Count IV against Lunden.

The allegations against Harmatz, on the other hand, are sufficient to allow this component of Count IV's § 1983 damage claim to proceed against her.  Plaintiffs have alleged conduct in which Harmatz herself engaged that supports a plausible inference of liability.  For example, Plaintiffs allege Harmatz had "personally taken specific actions to confine Ms. Murphy in this dangerous home, and to harm and torment Ms. Murphy and her family," and had "intentionally caused emotional distress to Ms. Murphy by directing ServiceNet staff to advise Ms. Murphy that she is being moved to a 'nursing home.'"  (Docket #42 at ¶¶ 13 and 181, respectively).  Plaintiffs allege that "Harmatz personally and directly communicated with individuals at ServiceNet concerning Ms. Murphy's care."  (Id. at ¶ 185).  Plaintiffs also allege that Harmatz failed to act, asserting that she "has not made any diligent efforts whatsoever to locate a state-operated home for Ms. Murphy, nor to rectify the serious dangers to Ms. Murphy's health, safety, and welfare that exist at the [ServiceNet] residence."  (Id. at ¶ 180). [10]  Whether viewed through the prism of supervisory or direct liability, these allegations are sufficient to

---

[10]  Plaintiffs include conduct from 2005 and 2008 that appears to be time-barred.  (Docket #42 at ¶¶ 127, 138, 141).   It is unclear how these allegations satisfy Massachusetts's three year general personal injury statute of limitations.  See Mass. Gen. Laws ch. 260, § 2A. "The accrual period for a Section 1983 action begins when the plaintiff knows or has reason to know of the injury which is the basis of the action."  Torres v. Superintendent of Police, 893 F.2d 404, 407 (1st Cir. 1990).  In any case, other allegations are within the limitations period, and Count IV is not susceptible to dismissal on this basis.

support a claim that Harmatz directly participated in, tacitly authorized, or was deliberately indifferent to the conduct that is alleged to have violated Murphy's rights.

Accordingly, it is recommended that the motion to dismiss Count IV be granted, except as to the allegations at ¶ 276(a) against Harmatz.

3.   <u>Count V: Alleged Constitutional and Statutory Violations</u>

In Count V, Plaintiffs allege the same four constitutional and statutory violations (again denoted as subparagraphs (a) through (d)), as in Count IV. The differences are that Count V is brought against the ServiceNet Defendants: Stubbs, Barshefsky, Frutkin, Hamdan, Pasternack, Moshiri, and Sacchetti; and sets forth allegations of their supervisory and direct liability. The analytical framework is identical to that used in Count IV, except that, as Plaintiffs implicitly recognize, Count V raises the additional question of whether Plaintiffs have alleged the requisite "state action" to recover under § 1983.

(a)  State Action

Section 1983 authorizes the assertion of a claim for relief against a party who, acting under color of state law, violated a federally protected right. <u>See</u> <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). Accordingly, a claimant must establish that the person who violated a federally protected right acted "under color of state law." <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988). To satisfy this element, Plaintiffs allege that the ServiceNet Defendants have acted under color of law "as creatures and instrumentalities of the state with respect to the provision of services to intellectually disabled individuals." (Docket #42 at ¶ 288). Elsewhere in the amended complaint they allege that the ServiceNet Defendants have acted under "color of law" by "operating and administering care for intellectually disabled individuals." (<u>Id.</u> at ¶¶ 2-3). The ServiceNet Defendants deny that ServiceNet is a state actor.

The Supreme Court has advanced a number of tests to determine whether conduct by a private party is "state action."  The tests focus on:  (1) whether there is a symbiotic relationship (<u>Burton v. Wilmington Parking Auth.</u>, 365 U.S. 715, 723-25 (1961)); (2) whether the private actor assumes a public function (<u>Flagg Bros. v. Brooks</u>, 436 U.S. 149, 157-58 (1978)); (3) whether the private actor is of such a close nexus to the state because the state has either ordered or coerced the private actor to action (<u>Blum v. Yarestsky</u>, 457 U.S. 991, 1004-05 (1982)); (4) whether there is joint participation (<u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 930-32 (1982)); and (5) whether the private and state actors are pervasively entwined (<u>Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n</u>, 531 U.S. 288, 297-98 (2001)).  While not exclusive, a finding of indirect state action can be made if any of these tests are satisfied.  The inquiry and outcome depend on the facts and circumstances of each case.  See <u>Brentwood Acad.</u>, 531 U.S. at 298. Consistent with this fact-specific approach, the court finds that Plaintiffs have alleged sufficient facts to support their claim that ServiceNet was a state actor based on the traditional public function or close nexus tests.

The traditional public function test is met in the select situations "where a state tries to escape its responsibilities by delegating them to private parties."  <u>Rockwell v. Cape Cod Hosp.</u>, 26 F.3d 254, 258 (1st Cir. 1994).  <u>Compare</u>, <u>West</u>, 487 U.S. at 54-56 (state was constitutionally obligated to provide medical treatment to injured inmates, and the delegation of that traditionally exclusive public function to a private physician gave rise to a finding of state action), <u>with</u> <u>Rendell-Baker v. Kohn</u>, 457 U.S. 830, 841 (1982) (no delegation found where a largely publicly-funded private school for troubled students could make discharge decisions without Constitutional challenge because those decisions "were not compelled or even influenced by any state regulation").  Here, Plaintiffs' allegations are sufficient at this stage to meet this test.  The

amended complaint notes that since the middle of the 19th Century, Massachusetts has been

providing facilities and care for persons with intellectual disabilities. (Docket #42 at ¶¶ 42-44).

Plaintiffs allege that the federal Medicaid program was expanded to help fund care for those with

developmental disabilities. (Id. at ¶ 50). Since 1985, Massachusetts has participated in the

HCBS Waiver, which allows it to use state and federal funds to care for individuals in a variety

of residential settings. (Id. at ¶¶ 54, 63). As demands for services increased, Massachusetts

began contracting with private corporations, such as ServiceNet, to care for the intellectually

disabled. (Id. at ¶ 71). DDS now contracts with approximately 300 private corporations that

operate homes and provide care to intellectually disabled persons. (Id. at ¶16). Of the $1.5

billion DDS budget for 2014, nearly $885 million was earmarked for privately-operated homes.

(Id. at ¶¶ 73-76). Accepted as true, these allegations support Plaintiffs' claim that ServiceNet,

though a private company, is a state actor in both the state and federal governments' schemes of

caring for and supporting the intellectually disabled. Cf. American Mfrs. Mut. Ins. Co. v.

Sullivan, 526 U.S. 40, 55-56 (1999) (rejecting the plaintiff's argument that the workers'

compensation insurer was a "state actor" where neither long-term relationship nor state statutory

scheme obligated the state to pay injured state workers).

These same allegations meet the close nexus test, where the inquiry focuses on whether

the government provided such significant encouragement that the alleged misconduct must be

deemed to be the conduct of the government. See Blum, 457 U.S. at 993. The fact that over

$800 million -- nearly three-quarters of the DDS annual budget -- is paid to private companies

like ServiceNet to provide care and facilities to intellectually disabled persons constitutes

significant encouragement.

Accordingly, the court finds that Plaintiffs' factual allegations satisfy the requirement of a § 1983 claim that the ServiceNet Defendants were acting under color of state law. The claim survives a challenge to the sufficiency of the allegations of state action.

(b)  Two-Tiered System of Care

Count V alleges the identical constitutional and statutory violations alleged in Count IV. (Docket #42 at ¶ 292 (a)-(d)).  As noted in connection with the court's analysis of Count IV, subparagraphs (b) through (d) depend on Plaintiffs' factually unsupported theory that there are two separate and unequal systems of residential care for the intellectually disabled in the Commonwealth.  The court recommends dismissal of (b) through (d) of Count V.

(c)  Sufficiency of subparagraph (a)

In Count V, at ¶ 292(a), Plaintiffs seek damages to compensate Murphy for alleged abuse and injuries in violation of the Fourteenth Amendment, based on claims independent of the two-tiered theory of care.  Thus, the court examines only Count V(a) to determine if it is sufficiently pleaded to show an entitlement to relief.

Plaintiffs' theory of liability is that the individual ServiceNet Defendants were supervisors, directing the policies that harmed Murphy.  The totality of the allegations against the ServiceNet Defendants, with the exception of Hamden, is that: the ServiceNet Defendants set policy, oversaw the hiring and firing of caregivers, set salaries, and established clinical protocols and procedures for the ServiceNet group homes; in other words, that the ServiceNet Defendants managed a culture that directly led to the harm suffered by Murphy.  (Docket #42 at ¶¶ 190-94). Plaintiffs also allege the ServiceNet Defendants paid themselves "astronomical salaries, from taxpayer funds, that otherwise would be available to pay, train, and supervise competent direct care workers at ServiceNet homes," (id. at ¶¶ 195-96); and that the care "in a grossly deficient

home operated by ServiceNet," (id. at ¶ 291), has harmed Murphy.  Defendants argue that the amended complaint fails to allege specific actions, including the affirmative link to liable subordinates.  This court agrees.

As discussed in Count IV above, supervisory liability depends on plausible allegations that show "(1) there is subordinate liability, and (2) the supervisor's action or inaction was 'affirmatively linked' to the constitutional violation caused by the subordinate."  Aponte Matos, 135 F.3d at 192.  The allegations here fail to meet the standard for pleading liability.  See Iqbal, 556 U.S. at 680-81. There are no allegations of specific actions by any ServiceNet Defendant; rather, with one exception, their liability is alleged collectively.  As a result, the amended complaint fails to allege that any ServiceNet Defendant harmed Murphy directly, or otherwise encouraged, condoned, or acquiesced in the actions of liable subordinates, or were deliberately indifferent to the actions of subordinates.  See Camilo-Robles, 175 F.3d at 43-44.  Indeed, Plaintiffs fail to allege, with the exception of one allegation involving Hamdan noted below, that the individual ServiceNet Defendants were aware of deficiencies in care provided to Murphy. Plaintiffs' reference to the salaries of the ServiceNet Defendants does not fill this void.

Plaintiffs' sole, particularized allegation is that Hamdan, ServiceNet's Vice President of Development/Brain Injury Service, had "personal knowledge of the harm Ms. Murphy [wa]s suffering, [and had] willfully and intentionally allowed it to continue."  (Docket #42 at ¶ 14). Even though this allegation takes a step toward stating a claim that is plausible on its face, it has not nudged Plaintiffs' claims of a constitutional violation far enough.  See Iqbal, 556 U.S. at 680-81.  It is conclusory and no allegations amplify or support the assertion of Hamdan's knowledge and failure to intervene.  Hamdan's position with ServiceNet as Vice President of Development/Brain Injury Service fails to suggest that Hamdan would have day-to-day dealings

with Murphy or her direct caregivers.  If Plaintiffs had alleged that Hamdan reviewed the shift

notes or medical records and was therefore on notice of the alleged harm to Murphy, <u>see</u>, <u>e.g.</u>,

<u>Fournier</u>, 851 F. Supp. 2d at 225, then their claim would be a step closer to plausible.  In the

absence of factual allegations concerning Hamdan's knowledge and encouragement, condonation

or acquiescence, or even gross negligence, Plaintiffs' allegation regarding Hamdan's "personal

knowledge" is conclusory and is not entitled to be assumed true.  <u>See</u> <u>Iqbal</u>, 556 U.S. at 680-81.

Accordingly, the motion to dismiss Count V should be granted.

### 4.  Count VII:  Injunctive Relief for Enforcement of Mass. Gen. Laws ch. 19B

Massachusetts General Laws ch. 19B authorizes DDS to engage private vendors to

provide services to intellectually disabled individuals.  Count VII seeks a permanent injunction

requiring DDS to allow Murphy (and others) to reside in state-operated homes.  Plaintiffs allege

that DDS has violated ch. 19B by "failing to allow Ms. Murphy and others to reside in state-

operated homes."  (Docket #42 at ¶ 315).  The predicate for this prayer for injunctive relief is

Plaintiffs' conclusory allegation that there are two separate and unequal systems of residential

care for the intellectually disabled in the Commonwealth, the state-operated homes that provide

adequate care, and the privately-operated homes that provide inferior care.  As noted above,

Plaintiffs have failed to allege sufficient facts to support this conclusory allegation that disparate

care exists on a systematic basis.  Accordingly, this court recommends dismissal of Count VII.

### 5.  Count VIII: Alleged Violation of Massachusetts Civil Rights Act

Count VIII asserts a claim for violations of the Massachusetts Civil Rights Act

("MCRA"), Mass. Gen. Laws ch. 12, § 11I.  Though brought against all Defendants, the doctrine

of sovereign immunity bars suit against DDS and its employees sued in an official capacity. [11] The analysis of Count VIII then is focused on the liability of Defendants Harmatz and Lunden in their individual capacities, and the ServiceNet Defendants.[12]

Here the constitutional and statutory rights at issue are identical to constitutional and statutory violations alleged in Counts IV and V (and further identified in those counts by subparagraphs (a) through (d)). (Docket #42 at ¶ 322). As noted in connection with the court's analysis of Counts IV and V, claims at subparagraphs (b) through (d) depend on Plaintiffs' factually unsupported theory that there are two separate and unequal systems of residential care for the intellectually disabled in Massachusetts. The court accordingly recommends dismissal of claims asserted at ¶¶ 322(b)-(d) of Count VIII.

With respect to Murphy's Fourteenth Amendment rights asserted at ¶ 322(a), as to Lunden and the ServiceNet Defendants, Plaintiffs have failed to allege that the interference or attempted interference with Murphy's rights was by "threats, intimidation or coercion." This is an essential element to succeed on a claim under the MCRA. See Layne v. Superintendent, Mass. Corr. Inst., Cedar Junction, 406 Mass. 156, 158 (1989); see also Bally v. Northeastern Univ., 403 Mass. 713, 718 (1989) ("We have … recognized that, by reaching private party

---

[11] See, e.g., Commonwealth v. Elm Medical Labs., Inc., 33 Mass. App. Ct. 71, 76 (1992) ("We conclude, for a number of reasons, that the Commonwealth is not a 'person' for purposes of c. 12, §§ 11H and 11I."); Williams v. O'Brien, 78 Mass. App. Ct. 169, 173 (2010) ("the Commonwealth, including its agencies, is not a 'person' subject to suit").

[12] Even though this court has found for purposes of Count V that ServiceNet is a state actor, it is unclear, and probably unlikely, that ServiceNet could claim the protections of the Eleventh Amendment. The court could find no clear case law. In the related area of "arm-of-the-state" jurisprudence, it notes that an important factor in finding immunity is the private entity's relationship to the public fisc. Put another way, unless Massachusetts was obligated to pay a judgment against ServiceNet arising out of ServiceNet's care for the intellectually disabled, it is likely not entitled to immunity. See Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean Cardiovascular Ctr. Corp., 322 F.3d 56, 67-68 (1st Cir. 2003).

actions, the Legislature did not intend to create 'a vast constitutional tort,' and thus explicitly limited the Civil Rights Act's remedy to situations where the derogation of secured rights occurs by threats, intimidation or coercion.").  Here, Plaintiffs rely exclusively on a formulaic recitation of this essential element, asserting "defendants have engaged in threats, intimidation, and coercion towards Ms. Murphy."  (Docket #42 at ¶ 324).   There are no factual allegations supporting instances of the use of threats or intimidation or coercion involving any ServiceNet Defendant or Lunden.  See Raymond v. City of Worcester, 142 F. Supp. 2d 145, 149 (D. Mass. 2001) (a failure to train, regulate, discipline or supervise is not actionable conduct under MCRA because it does not involve "threats, intimidation or coercion").  The singular formulaic allegation is insufficient to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678.

However, the court recommends that the claim at ¶ 322(a) of Count VIII be permitted to proceed against Harmatz.  In the context of the MCRA, a "threat" consists of "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm."  Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474 (1994).  Plaintiffs have alleged, among other things, that Harmatz "has personally taken specific actions to confine Ms. Murphy in this dangerous home, and to harm and torment Ms. Murphy and her family," and has "intentionally caused emotional distress to Ms. Murphy by directing ServiceNet staff to advise Ms. Murphy that she is being moved to a 'nursing home.'"  (Docket #42 at ¶¶ 13 and 181, respectively).  Accepted as true, these allegations are sufficient at this stage of the proceedings to support a claim under the MCRA.

Accordingly, it is recommended that the claim at ¶ 322(a) of Count VIII be allowed to proceed against Harmatz in her individual capacity, and dismissed as to the other Defendants.

6. Count IX:  Intentional Infliction of Emotional Distress

Count IX alleges that Defendants Harmatz and Hamdan intentionally inflicted emotional distress on Murphy.  Defendants seek dismissal, contending that Plaintiffs fail to allege facts showing extreme or outrageous conduct, and that Defendants are protected by qualified immunity.  Count IX is silent as to whether DDS employee Harmatz and ServiceNet employee Hamdan are sued in their official and/or personal capacities (as they are named in the amended complaint).  To cut to the chase, to the extent Count IX is alleged against Harmatz in her official capacity, it is barred by the doctrine of sovereign immunity.  Accordingly, the court turns to Defendants' arguments for dismissal.

To maintain a claim for intentional infliction of emotional distress, a plaintiff must establish that a defendant:  (1) intended to inflict emotional distress by (2) undertaking actions that were extreme and outrageous, thereby (3) causing emotional distress to the plaintiff, which (4) was severe so that no reasonable person could be expected to endure it.  See Young v. Wells Fargo Bank, NA, 717 F.3d 224, 240 (1st Cir. 2013); Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976).  The "extreme and outrageous" element of an intentional infliction of emotional distress claim

> cannot be predicated upon "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," … rather, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).  "The standard for making a claim for intentional infliction of emotional distress is very high."  Doyle v. Hasbro, Inc., 103 F.3d 186, 195 (1st Cir. 1996).  "Recovery on such a claim requires more than 'that the defendant has acted with an intent which is tortious or even

criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" <u>Id.</u> (quoting <u>Foley</u>, 400 Mass. at 99). Allegations found sufficiently "extreme and outrageous" to survive a motion to dismiss include: physically shoving, yanking and jerking a plaintiff, (<u>Lloyd v. Burt</u>, 997 F. Supp. 2d 71, 84 (D. Mass. 2014)); repeated phone calls to collect on a debt that resulted in a plaintiff suffering heart attacks, (<u>George v. Jordan Marsh Co.</u>, 359 Mass. 244, 255-56 (1971)); engaging in a contest with another employee to see who could sleep with the most high school students, (<u>Fournier</u>, 851 F. Supp. 2d at 225); and repeated misrepresentations regarding intentions to retain the plaintiffs and then firing them at a critically embarrassing moment, (<u>Putnam v. Adams Comm. Corp.</u>, No. 84-0355-S, 1987 WL 13262, at *9 (D. Mass. June 15, 1987)).

Applying these precedents, as to Hamdan, Plaintiffs allege that he (a) is the Vice President of Development/Brain Injury Service at ServiceNet, who was compensated in 2012 at $128,849.00; and (b) was "aware of the severe harm being inflicted on Murphy," and "willfully allowed this harm to occur." (Docket #42 at ¶¶ 331-335). No other facts are alleged about Hamdan, and therefore no facts are alleged supporting a claim that he acted in an "extreme and outrageous" manner with regard to Murphy's placement and care. Thus, the ServiceNet Defendants' motion to dismiss Count IX with respect to Hamdan, in both his official and his individual capacities, should be granted.

As to Harmatz, Plaintiffs allege generally in Count IX that "Harmatz has acted extremely and outrageously, and beyond all bounds of decency." (<u>Id.</u> at ¶ 330). Elsewhere in the amended complaint, they allege that Harmatz "has personally taken specific actions to confine Ms. Murphy in this dangerous home, and to harm and torment Ms. Murphy and her family," and has

"intentionally caused emotional distress to Ms. Murphy by directing ServiceNet staff to advise Ms. Murphy that she is being moved to a 'nursing home.'" (Id. at ¶¶ 13 and 181, respectively).[13] In the context of action taken against, and statements to, an intellectually disabled individual, the allegations involving Harmatz, accepted as true, are sufficiently outrageous to permit this claim to proceed. See Guckenberger v. Boston Univ., 957 F. Supp. 306, 318 (D. Mass. 1997) (in determining whether conduct is "extreme and outrageous," an important consideration is the relationship of the parties, and the defendant's knowledge of the plaintiff's sensitivities).

Accordingly, this court recommends that the motions to dismiss Count IX be granted as to Hamdan and denied as to Harmatz in her individual capacity.

7.  Count X:  Negligent Infliction of Emotional Distress

Count X asserts a claim for negligent infliction of emotional distress against all Defendants.  As discussed throughout this report and recommendation, the doctrine of sovereign immunity bars claims against the DDS Defendants in their official capacity.[14]  This court turns to the sufficiency of the allegations regarding Lunden and Harmatz, in their individual capacities, and regarding the ServiceNet Defendants.

To state a plausible claim for negligent infliction of emotional distress, a plaintiff must plead "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by

---

[13]   The Plaintiffs allege other conduct by Harmatz that occurred in 2005 and 2008, (see id. at ¶¶ 127, 138, 141), that is likely outside the statute of limitations.

[14]   In the alternative, the DDS Defendants rightly direct the court to the prerequisites of the Massachusetts Tort Claims Act, arguing that Plaintiffs fail to allege presentment.  See Mass. Gen. Laws ch. 258, § 4; see also Loan v. Town of Framingham, No. 12-40148-TSH, 2014 WL 1220899, *4 (D. Mass. 2014) (dismissing negligence claim due to the plaintiff's failure to present his claim to the town); Vasys v. Metro. Dist. Commission, 387 Mass. 51, 55-56 (1982). To the extent Plaintiffs argue there is an exigency exception to the presentment letter (Docket #54 at p. 14), that argument fails.  No such exception exists.  Without presentment, Plaintiffs could not maintain a negligence claim against DDS.

objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." Sullivan v. Boston Gas Co., 414 Mass. 129, 132 (1993). There are no specific allegations in Count X as to what Lunden, Harmatz, or the individual ServiceNet Defendants did. Instead, Plaintiffs allege in conclusory terms that "each of the defendants have acted to cause physical and emotional harm" to Murphy, and violated their duty of reasonable care "by allowing the conduct described in more detail herein to be visited upon Ms. Murphy." (Docket #42 at ¶¶ 338-40). Thus, the court, like Defendants, is left to comb through the 359 paragraphs of the seventy-page amended complaint to assess what role, if any, Defendants had in the instances of negligence and misconduct alleged therein.

Plaintiffs allege "ServiceNet": recklessly failed to treat Murphy for dangerously high blood pressure for seven months in 2013; deliberately and recklessly failed to address Murphy's lying in her own body waste; failed to investigate threats of violence a staff member made to Murphy; failed to adequately supervise Murphy, resulting in Murphy getting laundry detergent in her eyes and jumping from a vehicle at a busy intersection; failed to remedy instances of theft from Murphy at a corporate home; and, failed to discharge an employee who stole money from Murphy. Plaintiffs allege that "DDS" failed to remedy repeated instances of theft from Murphy at a corporate home. Alleging that "ServiceNet" or "DDS" engaged in conduct does not satisfy Plaintiffs' burden to plead how Lunden and the individual ServiceNet Defendants were involved in and are liable for this alleged conduct. Indeed, it is settled that "the complaint should at least set forth minimal facts as to who did what to whom, when, where, and why – although why, when why means the actor's state of mind, can be averred generally." Educadores, 367 F.3d at 68. The amended complaint fails in this modest requirement. While the allegations against the

entity, Defendant ServiceNet, are sufficient to survive dismissal, the allegations of as to Lunden and the individual ServiceNet Defendants are not.

For the reasons stated in the court's analysis of the sufficiency of Counts IV, VIII, and IX, the claim against Harmatz in her individual capacity should be permitted to proceed. Plaintiffs have adequately pleaded a claim for negligent infliction of emotional distress, alleging, among other things, her role in failing to comply with the 2008 agreement, and to rectify the serious dangers to Murphy's health, safety, and welfare that exist at the privately-operated home, and her participation in causing Murphy to be threatened with placement in a nursing home. Plaintiffs have also alleged that Murphy suffered harm as a result of Harmatz's alleged behavior. The motion to dismiss Count X against Harmatz in her individual capacity should be denied.

### 8. Counts XII , XIII, XIV: Permanent Injunctive Relief

In Counts XII, XIII and XIV, Plaintiffs seek permanent injunctions requiring DDS Secretary Polanowicz and DDS Commissioner Howe to enforce: the Medicaid Act and Rehabilitation Act (Count XII); Mass. Gen. Laws ch. 19B (Count XIII); and, the protections of the U.S. Constitution and Massachusetts Declaration of Rights (Count XIV). It is apparent from a plain reading of these counts that they all depend on Plaintiffs' factually unsupported theory of recovery; namely, that there are two separate and unequal systems of residential care for the intellectually disabled in the Commonwealth. All three counts seek to fix an allegedly broken, two-tiered system; but, as noted above, Plaintiffs have failed to allege sufficient facts to support the conclusory allegation that disparate systems of care exist. For instance, in Count XII, the Plaintiffs request an injunction to address the "ongoing violations" of the Medicaid Act and Rehabilitation Act that are alleged "in the preceding paragraphs of this Complaint." Because the court finds the preceding paragraphs fail to plead sufficient factual allegations to support the

two-tiered theory, the factual predicate for this Count (and Counts XIII and XIV) is missing; thus the claims for injunctive relief fail as a matter of law.  See Iqbal, 556 U.S. at 678.  Accordingly, this court recommends that the motion to dismiss Counts XII, XIII and XIV be granted.

IV.    CONCLUSION[15]

For the reasons stated, I recommend that the motions to dismiss (Dockets #48, #50, #62) be granted in part and denied in part, with the result that the following claims survive: Count IV, ¶ 276(a) against Harmatz in her individual capacity; Count VIII, ¶ 322(a), against Harmatz in her individual capacity; Count IX against Harmatz in her individual capacity; and Count X against Harmatz in her individual capacity, and ServiceNet.


/s/David H. Hennessy
David H. Hennessy
United States Magistrate Judge

---

[15] The parties are hereby advised that, under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file specific written objections thereto with the Clerk of this Court **within fourteen (14) days** of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objections are made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within 14 days after being served with a copy thereof.